IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| CORE CAPITAL PARTNERS GP, LLC, RON YAIR AND DAVID LYNCH, <br><br> Plaintiff, <br><br> vs. <br><br> WRIGHT CAPITAL CORPORATION and DON WRIGHT <br><br> Defendants. | CIVIL ACTION NO. <br><br> |

## ORIGINAL COMPLAINT

Plaintiffs Core Capital Partners GP, LLC, ("Core Capital"), Ron Yair ("Mr. Yair"), and David Lynch ("Mr. Lynch"), (Core Capital, Mr. Yair, and Mr. Lynch, collectively, "Plaintiffs") by and through their attorneys, file their Original Complaint against Defendants Wright Capital Corporation ("Wright Capital") and Don Wright (Wright Capital and Don Wright are collectively referred to herein as "Defendants"). In support thereof, Plaintiffs respectfully allege and aver as follows:

### I.   PARTIES

1.   Plaintiff Core Capital is a Delaware limited liability company with its principal place of business at 335 Madison Avenue, Mezzanine Level, New York, New York 10017. Ron Yair ("Mr. Yair") and David Lynch ("Mr. Lynch") are Core Capital's founders and serve as the company's Managing Directors. As more fully described hereafter, Mr. Yair and Mr. Lynch previously did business under the trade name Wright Capital New York. Wright Capital New York is not, and never has been, a formed legal entity.

2.   Plaintiff Ron Yair is a resident of the State of New Jersey.

1

3.      Plaintiff David Lynch is a resident of New York, New York.

4.      Defendant Wright Capital is a Texas corporation with its principal place of business in Taylor County, Texas. Wright Capital can be served with process through its registered agent, Justin Wright, at 2101 Shoreline Drive, Abilene, Texas 79602, or anywhere else where he may be found.

5.      Defendant Don Wright is a resident of Taylor County, Texas. Upon information and belief, Mr. Wright may be served with process at his residence, 2101 Shoreline Drive, Abilene, Texas 79602, or anywhere else where he may be found.

## II.     JURISDICTION AND VENUE

6.      This is an action for, *inter alia*, the resolution of an existing conflict under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

7.      The Court has personal jurisdiction over Defendants because the Defendants maintain sufficient contacts with the State of New York to establish general and/or specific jurisdiction and because, as set forth hereinafter, Defendants committed tortious acts within the State of New York and outside the State of New York causing injury to person or property within the State of New York that Defendants expected or reasonably should have expected to have consequences within the State of New York.

8.      The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332 and 1338. This is an action between citizens of different states. The amount in controversy exceeds $75,000. Further, this is a civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks, and/or this is a civil action asserting a claim of unfair competition joined with a substantial and related claim under the copyright, patent, plant variety protection or trademark laws.

9. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(a) and (c) because (i) a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of the property that is the subject of the action is situated, in the Southern District of New York; and (ii) Wright Capital is deemed to reside in the Southern District of New York because its contacts with the district are sufficient to subject it to personal jurisdiction if the district were a separate State.

### III. FACTS

10. Plaintiffs partner with major financial institutions, boutique investment banks, developers, private equity funds and hedge funds to identify, analyze and structure transactions. During their decades of service in major financial institutions and investment banks, Mr. Yair and Mr. Lynch, and Core Capital, by extension, have carefully cultivated relationships across the financial community.

11. As a result, Plaintiffs are highly respected for their knowledge, expertise and honesty. Plaintiffs' reputations are central to their ability to operate their business because Plaintiffs specialize in illiquid assets and in transactions that otherwise may not be possible to finance in traditional capital markets.

12. Small businesses and troubled industries, such as construction, real estate, and oil & gas, lost access to funding when the credit markets failed in 2008. Banks, private equity firms, and hedge funds will only lend to these troubled companies when they trust the transaction's facilitator. Plaintiffs are known in the industry to be trustworthy. Investment partners rely on Plaintiffs to ensure transparency in due diligence, pristine analytics to support sound investment decisions, and structures that properly balance the needs of the company and the risks to the investor.

13. In exchange for these specialized services, Plaintiffs generally receive compensation on the transaction when it closes. Plaintiffs also serve as an investment sponsor and may take equity stakes in companies through fund affiliates. In this respect, Plaintiffs and the companies in which they invest are encouraged to focus on long-term success.

14. Starting in early 2009, Mr. Yair and Mr. Lynch discussed working with Defendants Don Wright and Wright Capital on introducing and placing companies with investors. At first, Mr. Yair and Mr. Lynch thought Wright Capital could be a good partner. Specifically, Don Wright stated that he and Wright Capital could help Mr. Yair and Mr. Lynch locate companies that fit a specific profile – companies that were well run and had good opportunities for growth, but that had lost access to capital because of their size or the industry in which they operated.

15. The parties discussed their views on how the relationship between the parties could be formalized, but did not arrive at any agreement. As no transactions were ever consummated, the issue was in the background as the parties looked for opportunities.

16. In order to preserve continuity as various opportunities were analyzed, Mr. Yair and Mr. Lynch used the trade name Wright Capital New York ("Wright New York"). Mr. Wright and Wright Capital specifically consented in writing to Mr. Yair and Mr. Lynch's use of this trade name irrevocably, and without limitation:

> This will confirm that, to the extent the permission of the undersigned is required in order to form the organization using the name, "Wright Capital New York" and to ***operate it for any business purpose***, the undersigned hereby irrevocably grant [sic] that consent to you, that organization, and your respective successors and assigns.

(*See* January 13, 2009 letter from Don Wright, on behalf of Wright Capital, attached hereto as **Exhibit A**, and incorporated herein by reference).

17. The Plaintiffs' use of the name Wright New York was not conditioned on the signing of any definitive agreements between the parties. The Plaintiffs' use of the name Wright New York was not conditioned on the payment of any royalties or commissions for the use of the name.

18. Over the next several months, Plaintiffs and Defendants could not come to an agreement on the terms of their relationship. Agreements to pay commissions for originations or to allow participations in transactions require crystal clear process delineation and payment triggers.

19. Plaintiffs offered to pay Defendants commissions for origination services in exchange for the Defendants granting Plaintiffs a right of first refusal and exclusivity for a certain period of time. Obtaining a right of first refusal and exclusivity on proposed transactions was central to Plaintiffs' business strategy -- Plaintiffs needed these terms to source and to attract permanent capital for their fund formation plans. Defendants refused to agree to provide the right of first refusal and refused to agree to any period of exclusivity. As a result, no agreement for the sharing of compensation for transactions sourced by Defendants was ever reached and no agreement for participation in any investments was ever reached.

20. During the negotiations in which they attempted to come to an agreement of the terms of an arrangement between the parties, Mr. Yair and Mr. Lynch used the name Wright New York in commerce, establishing Wright New York as their trade name.

21. In October of 2009, Defendants stopped having regular communications and showing Plaintiffs new transactions. Plaintiffs continued to offer Defendants written drafts of agreements, but Defendants refused to enter into a contract with Plaintiffs. The parties continued to operate autonomously for the next several months.

22. In late January of 2010, Mr. Yair found a company in California called L&W Stone Corporation ("L&W Stone") through contacts he made on the professional networking website. L&W Stone needed capital, and fit the Plaintiffs' client profile – it was a company that lost access to the credit markets when the construction industry failed. It was clearly the type of company that Plaintiffs wanted to help.

23. During discussions with L&W Stone and its agents, Mr. Yair learned that Defendants had reviewed the proposed transaction a few months before, and they had rejected the L&W Stone transaction. This was very surprising, because Defendants had never told Plaintiffs about L&W Stone, nor had they described the potential opportunity. The transaction was exactly the type of transaction that Defendants represented that they would be able to originate for Plaintiffs.

24. Plaintiffs felt that they would be able to help L&W Stone find capital. In an abundance of caution, and to ensure that there was no confusion, Mr. Yair asked if there was any documentation showing that Defendants had turned L&W Stone down. The answer was yes.

25. By email to Scott Laine, Chief Executive Officer of L&W Stone, dated November 30, 2009, Defendants had indeed refused to take on L&W Stone as client, stating "[a]s of this morning, Mr. Wright informed me we will not be able to do this deal. The balance sheets [sic] are not strong enough for us to make it work at this time."

26. As L&W Stone fit with the Plaintiffs' client profile, Plaintiffs would have expected Defendants to have passed along some information regarding the company. But not only did Defendants fail to introduce L&W Stone to Plaintiffs, Defendants had actually referred L&W Stone to someone else.

27. This was not the only time Plaintiffs were alerted to less than forthright business practices on the part of the Defendants. The more Plaintiffs learned of the true operations of Don Wright and Wright Capital, the more it became clear that Plaintiffs risked their most valuable asset – their reputation – by continuing to look at opportunities together.

28. The staff of Wright Capital is composed of Don Wright's four family members; and women Don Wright refers to as his "girls," who make outbound cold calls and use other direct marketing means to solicit potential clients under false pretenses.

29. Defendants are brokers. However, Defendants deliberately mislead prospective clients into believing that Defendants are lenders with investment funds. On at least two occasions, a prospective borrower asked Don Wright whether he was a broker. In a series of emails to the prospective borrower, Don Wright lied and wrote he was not a broker, but a lender.

30. By misrepresenting that they will be funding the transaction, Defendants fraudulently induce prospective clients to agree to pay Defendants' fees. Borrowers are led to believe that the fee is payment to the lender, but it is actually a brokerage fee. After signing the contract, the client is in for a rude surprise – a true lender shows up, agrees to fund the transaction, and requests an industry standard lender's fee as part of the proposed loan. The borrower, usually a troubled company that is desperate to complete the financing, is left paying the true lender's fee, plus the Defendants' brokerage commission, at closing.

31. In addition to outright lying to prospective borrowers and claiming that Defendants were lenders and not brokers, Defendants have no intention of doing the work required to actually consummate a transaction. Defendants do not perform customary professional due diligence. Defendants do not use financial analysis, credit analysis, or objective criteria and support for either approving or declining transactions. Upon information and belief,

Defendants do not believe that they need to comply with state or federal regulations and have no use for state or federal securities licenses.

32. Defendants' goal is to sign up as many clients as possible to these fraudulent contracts, and reap hefty commissions – sometimes in the millions of dollars – if a true lender completes the deal.

33. It was not just Defendants' failure to serve their clients or operate using a bare minimum of expected business practices and processes that troubled Plaintiffs. On several occasions, Defendants represented that an agreement was in place between Defendants and the borrower where in fact one was not. Plaintiffs, in reliance on the fraudulent representation, would undertake diligence and begin to work with the company on structuring the transaction and locating investors.

34. Don Wright sought to bring Plaintiffs into his web of deceit, requesting that Plaintiffs lie and tell the prospect that the Defendants were lenders with investment funds. Plaintiffs steadfastly refused to participate in the fraudulent scheme. Defendants sought to use the relationships, contacts, and reputation of Mr. Yair and Mr. Lynch and the name of Wright New York to further their fraudulent scheme and for their own competitive advantage.

35. Defendants falsely mislead prospective clients and investors as to the relationship between Plaintiffs and Defendants. Defendants sought to cause confusion by representing that because Plaintiffs are in the process of raising investment funds and could act as investors in a prospective client's deal, Defendants were therefore lenders as well. Defendants even falsely claimed to have participated in transactions completed by Mr. Yair and Mr. Lynch in their prior positions – transactions that Defendants had no involvement in. On at least one occasion, Defendants sent biographical information on Mr. Yair and Mr. Lynch to a prospect for the

purpose of reaping the benefit of association with Plaintiffs' reputation and experience with major global financial institutions as well as misleading the prospect into believing that Defendants were lenders with investment funds.

36.     Defendants, in bad faith, traded on Plaintiffs' names, reputations for integrity and fair dealing, and prior accomplishments to induce clients to sign client contracts and pay Defendants' fees. Defendants falsely represented that they were affiliated with Plaintiffs on the one hand, all while steadfastly refusing to sign any agreements with Plaintiffs on the other hand.

37.     Not a single deal between Defendants and Plaintiffs was ever closed. Defendants actively prevented Plaintiffs from conducting due diligence and analytical work on prospective borrowers. At one point, Don Wright forbid Plaintiffs from speaking and asking any direct questions of the prospective borrowers, stating that Plaintiffs need only "hit the forward button" and pass the limited information he provided about the company along to Plaintiffs' investors. Plaintiffs refused to deceive their partners and damage their reputations in such a manner. In retaliation, Defendants stopped showing new transactions to Plaintiffs.

38.     The L&W Stone deal progressed. Plaintiffs entered into an agreement with L&W Stone whereby L&W Stone granted Plaintiffs the exclusive mandate to provide the contemplated financing (the "Mandate Letter"). Mr. Yair and Mr. Lynch introduced L&W Stone to a funding partner, Advisco Capital Corp. ("Advisco"). Mr. Yair and Mr. Lynch coordinated the due diligence, analytics and structure of the transaction. On March 3, 2010, Advisco, as lender, and L&W Stone, as borrower, entered into a proposal letter for a $5,000,000 secured revolving credit facility, secured equipment term loan, and secured term loan (the "Loan Commitment"). Under the Loan Commitment, Plaintiffs are recognized as the broker of record to be paid from the loan proceeds at closing.

39. A few weeks after the signing of the Mandate Letter and Loan Commitment, one of the women from Defendants' offices contacted Mr. Laine to ask whether he had proceeded to contact the third party Defendants recommended when Defendants rejected the transaction. Mr. Laine told her that he was working with Plaintiffs.

40. Thereafter, Defendants began to unjustifiably and without basis demand payment of a commission on L&W Stone. There is no agreement between L&W Stone and Defendants. There is no agreement between Plaintiffs and Defendants. There is no agreement between Advisco and Defendants.

41. Even if the Plaintiffs and Defendants had been able to come to terms – Defendants did not originate the L&W Stone transaction. Mr. Yair learned about L&W Stone independently of Defendants, through his own contacts. Defendants had performed no work on the L&W Stone transaction and in fact had rejected the transaction outright in November of 2009, without even telling Plaintiffs about the opportunity.

42. On March 22, 2010, Mr. Yair sent Don Wright an email stating that because the parties could not even communicate, let alone formalize what their ongoing relationship would or could be, it was time to part ways. Mr. Yair reminded Don Wright that he had the right to use the name Wright New York, but out of courtesy he would stop using the trade name.

43. On March 31, 2010, an attorney for Defendants sent cease and desist letters to Mr. Yair and Mr. Lynch, falsely demanding that Defendants were owed commissions, that Plaintiffs had interfered with Defendants' clients, and requesting that they cease and desist from representing that they have any connection with Wright Capital.

44. The attorney also sent a separate letter, to Advisco, the lender on L&W Stone, falsely claiming that Defendants were L&W Stone's brokers and demanding a commission. The

Defendants maligned Plaintiffs to Advisco and falsely claimed that Plaintiffs had acted improperly. Defendants further threatened to send L&W Stone a similar letter, if Plaintiffs and Advisco choose not to accede to these unjustified demands.

45. Advisco advised Plaintiffs that the dispute between Plaintiffs and Defendants endangers the transaction.

46. Defendants have cast a cloud over Plaintiffs' reputation in the investor community by falsely representing that Plaintiffs have improperly refused to pay commissions to Defendants, and falsely maligning Plaintiffs' untarnished reputations for honesty and best practices, thereby breaking up deals and potential deals with investors and clients. Defendants are using sham "cease and desist" letters, pressure tactics, unreasonable bad-faith demands of Advisco and other current investor partners of Plaintiffs, as well as starting false rumors and intending that they reach Plaintiffs' potential investor partners.

47. All conditions precedent to the relief sought herein have been met, satisfied, or waived.

## IV.   CAUSES OF ACTION

### COUNT I

### (Declaratory Judgment)

48. Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if fully set forth herein.

49. Plaintiffs' legal rights are affected by a certain contracts and alleged contracts Defendants allege to exist between Plaintiffs and Defendants.

50. A dispute exists as to the existence, validity and interpretation of the contracts and alleged contracts.

51.  A dispute exists as to existence, validity and ownership of the trade name Wright Capital New York.

52.  Pursuant to 28 U.S.C. § 1201, Plaintiff seeks a declaration of the rights, status and other legal relations of the parties. Specifically, Plaintiff seeks the following declarations:

(a) There is no valid contract in place between Plaintiffs and Defendants which would require Plaintiffs to pay or provide remuneration in any form to Defendants;

(b) There is no valid contract in place between Plaintiffs and Defendants which would require Plaintiffs to pay or provide remuneration in any form to Defendants related to the L&W Stone transaction;

(c) There is no valid contract in place between Plaintiffs and Defendants which would prevent Plaintiffs from soliciting existing or prospective clients of Defendants;

(d) Plaintiffs are owners of the trade name Wright New York; and/or

(e) Plaintiffs have irrevocable and unlimited use of the trade name Wright Capital New York.

53.  Pursuant to 28 U.S.C. § 2202 Plaintiffs request attorneys fees, costs and other further and necessary proper relief from Defendants as the Court deems is equitable and just.

## COUNT II

### (Tortious Interference with Contract)

54. Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if fully set forth herein.

55. Pleading further and in the alternative, Plaintiffs are parties to the Mandate Letter;

56. Pleading further and in the alternative, Plaintiffs are parties and/or third party beneficiaries to the Loan Commitment.

57. The Mandate Letter and Loan Commitment are valid contracts.

58. Defendants knew of the valid contracts.

59. As described above, the Defendants wrongfully, knowingly, intentionally, and maliciously interfered with the Mandate Letter and the Loan Commitment with the intent to induce breaches thereof. The Defendants were solely motivated by their intent to injure the Plaintiffs. The Defendants' tortious conduct is a direct and proximate cause of damages to Plaintiffs that would not have occurred but for the Defendants fraudulent conduct.

## COUNT III

### (Tortious Interference with Prospective Business Relations/Economic Advantage)

60. Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if fully set forth herein.

61. Pleading further and in the alternative, Plaintiffs had a business relationship with Advisco, L&W Stone, and other prospective partner investors and borrowers and there is a reasonable probability that Plaintiffs would have entered into a business relationship with Advisco, L&W Stone, and other prospective partner investors and borrowers.

62. Defendants were aware of these relationships.

63. Defendants intentionally interfered with these relationships, causing injury to them.

64. Defendants' conduct was independently tortious or unlawful.

65. Defendants acted solely out of malice, or used dishonest, unfair, or improper means.

66. Defendants' tortious conduct is a direct and proximate cause of damages to Plaintiff.

## COUNT IV

### (Trademark Infringement)

67. Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if fully set forth herein.

68. Pleading further and in the alternative, in connection with services, Plaintiffs have ownership in a legally protectable common law trademark. Defendants infringed on this mark in a manner in which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of such person with another person, or as to the origin, sponsorship, or approval of goods, services, or commercial activities, or, in commercial advertising or promotion, misrepresented the nature, characteristics, qualities, or geographic origin of another person's goods, services, or commercial activities.

69. Defendants acted in bad faith.

70. As result of Defendants' infringement, Plaintiffs have suffered damages.

## COUNT V

### (Invasion of Privacy)

71. Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if fully set forth herein.

72. Pleading further and in the alternative, Defendants, for business and for commercial purposes, used the names, likeness, and accomplishments of Plaintiffs Mr. Yair and Mr. Lynch to advertise Defendants' business. The Defendants intentionally intruded on Mr. Yair and Mr. Lynch's solitude, seclusion, or private affairs, and such the intrusion would be highly offensive to a reasonable person.

### V.     JURY DEMAND

73. Plaintiffs demand a jury trial.

### VI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that the Court issue judgment against Defendants Wright Capital Corporation and Don Wright on all counts, and award Plaintiffs:

  a. Actual damages resulting from Defendants' conduct, but in an amount not less than $75,000;

  b. Incidental, consequential, and exemplary damages, as permitted by law;

  c. Pre-judgment and post-judgment interest as provided by law;

  d. Attorneys' fees and costs, as permitted by law; and

Original Complaint - Page 15

  e.  Such other and further relief, at law or in equity, to which it may be justly entitled.

            Respectfully submitted,

            ALSTON & BIRD LLP

            */s/ Michael P. De Simone*
            Michael P. De Simone
            michael.desimone@alston.com
            90 Park Avenue
            New York, New York 10016
            Telephone: 212-210-9400
            Facsimile: 212-210-9444

Of counsel:
MILLER, EGAN, MOLTER & NELSON LLP
Kerry C. Peterson
kerry.peterson@milleregan.com
Matthew D. Rinaldi
matt.rinaldi@milleregan.com
4514 Cole Avenue, Suite 1250
Dallas, Texas 75205
Telephone: (214) 628-9500
Facsimile: (214) 628-9507

            **ATTORNEYS FOR PLAINTIFFS CORE CAPITAL PARTNERS GP, LLC, RON YAIR AND DAVID LYNCH**